WELCH, Judge.
A Lawrence County grand jury returned a nine-count indictment against Jason Bart Naylor based on allegations that he engaged in various sex acts with his minor stepdaughter, B.J.: Counts I, III, and V charged Naylor with first-degree rape for engaging in sexual intercourse with B.J. by forcible compulsion, in violation of § 13A-6-61, Ala.Code 1975; counts II, IV, and VI charged Naylor with second-degree rape for engaging in sexual intercourse with B.J., who was less than 16 years of age and more than 12 years of age, while Naylor was 16 years of age or older and at least 2 years older than B.J., in violation of § 13A-6-62, Ala.Code 1975; count VII charged Naylor with first-degree sodomy for subjecting B.J. to deviate sexual intercourse by forcible compulsion, in violation of § 13A-6-63, Ala. Code 1975; count VIII charged Naylor with second-degree sodomy and alleged that Naylor, being more than 16 years of age, engaged in deviate sexual intercourse with B.J., who was less than 16 years of age and more than 12 years of age, in violation of § 13A-6-64, *1065 Ala.Code 1975; and count IX charged Naylor with incest for engaging in sexual intercourse with B.J., whom he knew to be his stepchild, while the marriage creating that relationship existed, in violation of § 13A-13-3, Ala.Code 1975. Immediately before the trial the State moved to dismiss counts V and VI of the indictment. The trial court granted the motion. Naylor was tried before a jury on the remaining counts. The jury found Naylor guilty of counts IV, VIII, and IX; the jury found Naylor not guilty of counts I, II, III, and VII. Naylor filed a motion for a new trial and raised issues regarding juror misconduct. The trial court conducted a hearing on the motion. The trial court thereafter held a sentencing hearing, and it sentenced Naylor to 10 years’ imprisonment on count IV, 15 years’ imprisonment on Count VIII, and 5 years’ imprisonment on count IX; the sentences in counts IV and IX were to run concurrently with one another and consecutively to the sentence for count VIII, for a total sentence of 25 years’ imprisonment. The trial court also ordered Naylor to pay fines and assessments to the crime victims compensation fund. Naylor filed an amended motion for a new trial. The trial court held a hearing on the amended motion for a new trial, and subsequently entered an order denying Nay-lor relief on all claims.
This appeal follows.
I.
Lawrence County Sheriffs Department Investigator Mike Agee testified that on September 16, 2009, he was contacted by Jennifer Owens with the Lawrence County Department of Human Resources (“DHR”) regarding B.J.’s report that she had been sexually assaulted by her stepfather, Nay-lor, about one and one-half years earlier. B.J. was 16 years old at the time of the report. He met with B.J. and her father, Mr. J.,[1] at Owens’s office, and B.J. gave a statement in which she claimed that Nay-lor had raped her in April 2008. Investigator Agee then went to the sheriffs department with B.J. and her father, and he obtained additional information from B.J. about the situation at home. B.J. told him that Naylor had raped her in her bedroom on three consecutive mornings, at approximately 4:30 a.m., before Naylor went to work. She said that on each occasion she woke up while Naylor was raping her. B.J. said that she suffered no physical injury and that she did not seek medical treatment following the incidents. B.J. told Inv. Agee that following the third time she told her mother that Naylor had raped her. During the ensuing investigation, Inv. Agee interviewed Naylor and B.J.’s mother, Melanie Naylor (“Melanie”). Melanie “was very defiant and adamant that this did not occur, it did not happen.” (R. 111.) She also told Inv. Agee that B.J. had never told her that Naylor had raped her. Inv. Agee testified that, based on the interview with B.J. and on his training and experience regarding sexual-assault victims, his opinion was that B.J. had been sexually assaulted by Naylor. (R. 149.)
On cross-examination, Inv. Agee acknowledged that, after he learned that B.J. had made additional allegations against Naylor in a later interview — allegations that Naylor had penetrated her with his fingers, had forced her to engage in oral sex, and that some of the assaults took place in the living room, he did not conduct any follow-up questioning of B.J. He did, however, speak to Monica Haddock, an employee at the Cramer Children Center, *1066 who had interviewed B.J., and he was satisfied with Haddock’s explanation of the reasons for the inconsistencies in B.J.’s allegations.
B.J. testified at trial that she was then 17 years old. She said her parents divorced in August 1997, and her mother married Naylor in July 2001. She lived primarily with her mother after her parents divorced, and Naylor moved into their home after he married Melanie. Melanie and Naylor had two children after they married; the children were eight years old and four years old at the time of trial, she said. B.J. stated that she had had a close relationship with her mother before the incidents for which Naylor was on trial, and she said that she and Naylor had a “typical, normal” relationship and she never felt uncomfortable around him. (R. 159.) B.J. said she had been in counseling at Alabama Psychiatric Services for attention deficit and hyperactivity disorder before these incidents occurred.
B.J. testified that she was awakened one morning by the rattling of her bedroom door, which she always locked at night to keep her younger brother and sister from entering her room. Her digital alarm clock indicated the time was 4:24. She said that Naylor told her to come to the door, but she did not get up. Naylor rattled the doorknob repeatedly and tapped on it, and he eventually was able to unlock the door. B.J. said that Naylor came into the room, pulled down her pants, and told her not to tell her mother or he would go to jail and her mother would lose the house. She said she did not scream because she was terrified. Naylor put his fingers in her vagina, touched her chest, and made her put his penis inside her mouth, she testified. B.J. said she did not know whether Naylor ejaculated and she added that, at the time this occurred, she had not yet had sex with anyone. He then pulled her pants up, pulled her shirt down, and left the house to go to work. He told her again not to tell her mother. During the incident Naylor also kissed her on the mouth and told her many times that she had a beautiful body, B.J. said. The incident lasted for 15 to 20 minutes, she said. B.J. said she did not call out or yell because she knew her mother would not hear her, and because she was frightened. She said she lay in bed until it was time for school, and she got up and went to school without telling her mother. She told two friends at school what had happened.
B.J. testified that Naylor assaulted her again, at approximately 10:00 p.m. the same day. She said that, while her mother was in the bathroom bathing one of the children, B.J. was in the living room with Naylor. He told her to pull down her jeans and bend over the couch. She bent over the couch, she said, and Naylor pulled her pants down and penetrated her with his penis. The incident lasted approximately 5 or 10 minutes, she said. B.J. said, “He didn’t finish.” (R. 174.) B.J. said that Naylor pulled up her pants, and she went to her bedroom. B.J. said she did not tell her mother.
B.J. said that Naylor unlocked her bedroom door again the following morning and he came into her room. He pulled her pants down, pulled his pants down, forced her to perform oral sex on him, and then penetrated her vagina with his penis, she said. She said the incident lasted approximately 15 or 20 minutes, and she did not know whether Naylor ejaculated. B.J. said that Naylor removed his penis from her vagina after he discovered that she had started her menstrual period. B.J. said that Naylor wiped himself off and went to work. B.J. said she told no one about that incident that morning. She said that she did not tell her mother imme *1067 diately because she was afraid her mother “would do something about it” and then they would lose their house because her mother did not have a job at the time. (R. 176.)
B.J. testified that she told her mother that afternoon that Naylor had raped her. Her mother confronted Naylor, she said. The following day, B.J. said, her mother asked B.J. to tell her everything that had happened, and her mother wrote everything down. B.J. said that her mother did not report the assaults to anyone, but she got a new lock for B.J.’s bedroom door, and Naylor was not permitted to be alone with B.J.
B.J. acknowledged that she went to her father’s house on the same day she told her mother about being raped and that she could have stayed with her father, but instead she telephoned her mother and asked her to take B.J. back home.
B.J. said that after these incidents she no longer obeyed her mother, she skipped school, and sometimes refused to come home. B.J. also testified that she had an accident on a four-wheeler and she broke some bones in her face; thereafter, when her mother said something to her that she did not like, B.J. said, “I would bang my face against the wall to hurt myself.” (R. 181.) She also abused alcohol and she stayed out all night with friends. B.J. said that on September 1, 2009, she and some male friends had inhaled compressed air from a spray can to get high, and soon after she had a serious accident in her car when she was driving home and broke a spinal vertebrae. While she was still in a neck brace after that accident, on September 11, 2009, she attempted to strike her mother, and the two had a violent physical altercation. B.J. testified that her mother told her that she was going to call Mr. J. B.J. said she told her mother to “go ahead,” because her mother had threatened to do it before, but had not done so. (R. 184.) B.J.’s mother did send B.J. to live with her father after the altercation.
B.J. testified that on the night her father came to get her from her mother’s house, and before they left her mother’s house, B.J. told her father that the reason she had been so out of control was that Naylor had raped her. Her father did not initially say anything while they were at the house. He did not contact the police, nor did her take her to DHR. B.J. said that a day or two later, after she began staying with her father, she wrote a note she intended to give to her mother at some later time. B.J. said in the note she ■wrote that she did not understand why her mother was not on her side and she expressed her lack of understanding of things her mother had done. B.J. said her father found the note and gave it to B.J.’s counselor, who made her father file charges against Naylor.
B.J. acknowledged that in 2007 she had overdosed on pills she took when she was angry at her mother for refusing to let her do something she had wanted to do.
B.J. also acknowledged that she had been in counseling sessions monthly or bimonthly after she was assaulted, but that she had not reported Naylor’s assaults because her mother was always in the room during the sessions. She also stated that she had initially told the interviewers that she had been raped three times, but she was raped only twice. She explained the inconsistent reports by stating that she had tried to put the incidents out of her mind during the 18 months after the assaults occurred, even though she was living with her rapist, that there had been much drama and chaos in her life, and that she was confused and felt abandoned. She testified that, contrary to her initial report to the investigator, she had been raped twice and not three times. She also said *1068 there were two instances of oral sex, both in her bedroom. She said that the first morning Naylor came into her room he touched her and made her perform oral sex. The next evening there was sexual intercourse, B.J. said, but then she added that oral sex had also occurred. She said that the following morning there was sexual intercourse and oral sex.
On cross-examination B.J. testified that for years she had wanted her parents to get back together after their divorce, and she had expressed very strong feelings on the issue several times on an Internet blog, even as recently as in 2007. She expressed in that forum that she was angry and admitted that during the summer or early fall of 2007 she cut herself to relieve her feelings of anger and rage, before any of the issues regarding Naylor occurred. B.J. said that her stepmother and Naylor prevented her parents from getting back together. She said that it bothered her that her parents were not together, and that her father and stepmother were going to have a baby that would have its parents together and that Naylor and Melanie’s children had then-parents together.
She also admitted that before the day her mother made her leave the house to live with her father, she and her mother had had another physical altercation and Naylor had pulled B.J. off her mother. B.J. admitted that she had telephoned her father that day and had told him that Naylor had hit her. B.J. testified that Naylor had not hit her. She acknowledged that Mr. J. became very upset when she told him, and that her report that she had been struck caused some problems. B.J. testified that she remembered telling her mother something like B.J. could call Mr. J. and tell him anything and that he would believe her. B.J. also recalled that, before she left her mother’s house, she told her mother something to the effect that, if she could not live there, no one was going to live there with her mother.
Two female friends and classmates of B.J.’s testified that she told them in April 2008 that her stepfather had raped her one evening in the living room.
Jennifer Owens testified that she was a service social worker with the Lawrence County DHR and that she conducted child-abuse investigations. She said that her office received a report from the local sheriffs office that led to her contact with B.J. in September 2009. Owens testified that she met with B.J. and her father and that an investigator with the sheriffs office then met with them. Owens said that B.J. described a series of four rapes by her stepfather that B.J. said had occurred on April 21, 22, and 23, 2008, in her bedroom and in the living room. Owens said that B.J. told her that, on the first and second mornings, her stepfather had digitally penetrated her and forced her to have sex. Owens said that B.J. reported that on the afternoon of the second day her stepfather made her have sex in the living room. She testified that B.J. told her that on the third morning her stepfather had sex with her again. B.J. did not mention oral sex with her stepfather at this initial interview. Owens testified that she observed B.J.’s forensic interview with Monica Haddock at the child-advocacy center. She acknowledged that B.J. had testified at trial that her stepfather had raped her twice and forced her to have oral sex twice, and that B.J.’s initial reports had differed from her testimony. It is not uncommon for child victims of sexual abuse to change a report regarding the number of times they had been abused if the abuse had occurred multiple times. Owens testified that based on her experience, her observations, and her investigation into B.J.’s case, she *1069 formed the opinion that B.J. was the victim of sexual abuse.
On cross-examination, Owens acknowledged that B.J. made several inconsistent statements in the interviews with her, Inv.. Agee, and Haddock. For example, B.J. told Owens that she woke up on the morning of the first rape when she heard Nay-lor trying to open her door, but a short time later she told Inv. Agee that she was awakened that first morning when Naylor was on top of her, raping her. When B.J. first reported the incidents during the interview with Owens and Inv. Agee, she did not mention anything about oral sex. During the subsequent interview, Haddock asked B.J. whether Naylor had put his mouth on her or whether she had to put her mouth on him, and only then did B.J. say that that had happened on each occasion Naylor had entered her bedroom. Owens also said that B.J. had stated during the initial interview that all the rapes occurred in her bedroom in the early morning hours, but that B.J. had also told her that Naylor had once raped her in the afternoon in the family’s living room. During cross-examination Owens also testified that, although she was an observer when Haddock interviewed B.J. on September 21, 2009, Owens did not create a written report of that interview until January 25, 2011. Although Owens’s report of that interview indicated that Inv. Agee had observed the interview with her, Owens testified that the report was incorrect, and that Inv. Agee had not been present.
Owens testified that she interviewed Melanie Naylor as part of her investigation. Melanie told Owens that she was not aware of any sexual abuse or rape of B.J. by Naylor, that she did not believe B.J., and that B.J. had lied to her about other things. Owens testified on redirect examination that Melanie later recanted, and told her that B.J. had reported in April 2008 that she had been sexually assaulted.
Mark Jacobs, a therapist at the Alabama Psychiatric Services, testified that he had had counseling sessions with B.J. beginning in 2006 because she was having struggles with attention deficit and hyperactivity disorder. He said that, beginning around April 2008, B.J.’s behavior reportedly deteriorated, and she exhibited more acting-out behaviors, violated curfew, was disrespectful, and began cutting herself. In September 2009, he met with B.J.’s mother and father, and it was disclosed to him then that B.J. had been sexually assaulted. Jacobs testified that B.J.’s behavior had been consistent with the behavior of a victim of sexual abuse.
On cross-examination Jacobs stated that he was aware that B.J. had issues with cutting herself and that she had taken an overdose of drugs, but he could not remember when those incidents had occurred. Jacobs reviewed his notes and acknowledged that one of the recurring issues he had noted in 2006, 2007, and before April 2008 were BJ.’s defiance, issues regarding parental control, and B.J.’s lying to her parents. Jacobs also testified that he sometimes met with B.J. alone, so that she had an opportunity to speak freely with him about anything that was on her mind or that was bothering her. He also stated that the types of acting-out behavior B.J. exhibited was not always indicative of sexual abuse. Jacobs further testified that he spoke with B.J.’s mother about B.J.’s allegations of sexual assault, and B.J.’s mother said she did not believe B.J., in part because B.J. had a history of not being truthful.
On redirect examination, Jacobs testified that, in his opinion, B.J. had been the victim of sexual abuse. On further cross-examination, Jacobs testified that he was aware that, approximately one week before *1070 the allegation was revealed to him in September 2009, B.J.’s mother had filed juvenile charges against B.J. Also at that time, Jacobs acknowledged, B.J. was recovering from injuries from a serious accident, and “there were issues going on there between her and her parents as it related to her treatment and where she was going to stay, which parents she was going to stay with.” (R. 371.)
Melanie Naylor testified that she and B.J.’s father divorced in 1997 and that she married Naylor in July 2001. She and Naylor divorced in October 2005, but they remarried in March 2006. Divorce proceedings for the Naylors were pending at the time of trial. Melanie testified that in April 2008 B.J. reported to her that Nay-lor had raped her. B.J. was very upset and was crying when she revealed the rapes, Melanie said. Melanie testified that she confronted Naylor immediately, and that Naylor said he knew that what he had done was wrong.
Melanie said that the next day she asked B.J. to tell her everything that had happened, and Melanie wrote it down. She said B.J. told her that she had awakened the first morning when Naylor was trying to open her bedroom door. Melanie said that B.J. told her that Naylor came into her room, pulled her pants down and her shirt up, kissed her all over her chest, and put his fingers inside her. Melanie said that B.J. told her that on that Monday night, Naylor had bent her over the end of the couch in living room and inserted his penis in her. B.J. told Melanie that Nay-lor had hurriedly pulled her pants up because Melanie was coming toward the living room. Melanie said that B.J. told her that the next morning Naylor came into her room again, pulled her pants down, and raped her. Melanie said that B.J. also told her that Naylor forced her to perform oral sex on him on both of those mornings in B.J.’s bedroom. Melanie said that she secretly recorded a conversation she had with Naylor that night in which she confronted him with B.J.’s allegations, and she hid a recording of that conversation, along with the pieces of underwear she believed B.J. and Naylor had been wearing on the morning of the final sexual assault. She said she later disposed of those items.
Melanie said that she did not do anything after B.J. told her about the multiple assaults because she was afraid no one would believe her and she was afraid Nay-lor would hurt her or her children. She said she tried to protect B.J. by getting locks for her bedroom and bathroom doors, and she made sure Naylor was not alone with B.J. Melanie also testified that she told B.J. not to tell anyone about the rapes, and she said she told B.J. that if she reported the rapes to anyone, Melanie would deny that they had happened.
Melanie said that after B.J. was raped, Melanie did not discipline B.J. at all, and she let B.J. do whatever she wanted. She testified that in May 2008, with her permission, B.J. severely damaged Naylor’s pickup truck, using various items such as a hammer, roofing tacks, spray paint, and a baseball bat. B.J. acted out frequently after April 2008; she yelled and screamed at Melanie, she punched and kicked holes in the walls of her bedroom, and she refused to go to school or to observe a curfew. Melanie said that, in December 2008 after B.J. had had an accident on her four-wheeler that resulted in B.J.’s breaking several bones in her face, B.J. intentionally banged her head against walls when she was upset. Melanie said B.J. had a serious accident in her car in September 2009, and when she got out of the hospital her behavior continued to deteriorate, and she verbally and physically attacked Melanie. Melanie filed charges in juvenile court against B.J. alleging harass *1071 ment and assault. She decided B.J. should stay with Mr. J., and when he came to pick B.J. up from the house, B.J. told him that Naylor had raped her.
A few days later, Melanie met with Mr. J. and employees at Alabama Psychiatric Services, where B.J. had been receiving counseling, and they confronted Melanie about B.J.’s rape allegations. Melanie testified that she denied the allegations, and she told them that B.J. was lying. Melanie testified that she also told DHR employees that she did not believe B.J.’s allegations. Melanie testified that in June 2010 she told investigators the truth, which, she said, was the same thing she had testified to at trial regarding the sexual abuse.
On cross-examination Melanie acknowledged that in the summer or fall of 2007, before B.J. made the rape allegations, B.J. had issues relating to harming herself by cutting herself, she took an overdose of pills, and she was having some issues with friends at school. Melanie also testified that, after she contacted Mr. J. to come get B.J. the final time, when B.J. realized that Melanie was not going to back down from the decision, B.J. stated to her: “If I can’t live here in our house, then nobody will.” (R. 437.)
B.J.’s father testified that on September 11, 2009, Melanie telephoned him and said that he needed to come get B.J., so he did. When he arrived at the house, Melanie said she was tired of B.J.’s acting out and she did not know what else to do; she was packing B.J.’s clothing and B.J. was crying. B.J. then told him that Naylor had raped her. Mr. J. said that he spoke to his daughter about her allegations that night and during the next two days, and that on the second day he saw a letter in his computer room that B.J. had written to her mother. He said he decided then to contact the authorities. He said that his delay in reporting the allegations was out of an abundance of caution so as not to make baseless accusations against Naylor.
Mr. J. acknowledged that not long before B.J. alleged that Naylor had raped her, B.J. had telephoned him and told him that Naylor had hit her. Mr. J. admitted that he had been very upset by that. However, Mr. J. said, he spoke with Nay-lor and Naylor said that B.J. and Melanie had been in a physical altercation and Naylor had pulled B.J. off of Melanie; B.J. then admitted to her father that Naylor’s explanation was true. Mr. J. also testified that he was aware that before April 2008 B.J. had had issues with cutting herself and that she had taken an overdose of pills, and that those issues had nothing to do with Naylor.
Monica Haddock testified that she worked at the Cramer Children Center, an agency that conducted forensic interviews of children when there were allegations or concerns about abuse. She interviewed B.J. on September 21, 2009, following a referral from DHR. Haddock said that B.J. reported to her that at 4:24 a.m. on the first morning Naylor came into her room and digitally penetrated her. She said that on three subsequent occasions he had sexual intercourse with her, once in the living room. Haddock said she asked B.J. whether Naylor had ever put his mouth on her, and B.J. said he had kissed her using his tongue. She asked B.J. whether Naylor had ever performed oral sex on her, and she denied that, but said that Naylor did make her perform oral sex on him. Haddock testified that B.J. said oral sex occurred every time sexual intercourse occurred, “so it would have been in the bedroom and living room.” (R. 468.) She said that B.J. “disclosed that he digitally penetrated her pretty much every time.” (R. 466.) Haddock testified that it was her opinion that B.J. had been the *1072 victim of the sexual abuse she had disclosed.
Haddock also testified that a child’s initial disclosure is typically the most accurate.
On cross-examination Haddock acknowledged that B.J.’s initial reports to Owens and to Inv. Agee differed somewhat from the report B.J. made to her. For example, Haddock acknowledged, B.J. had told Haddock that digital penetration and oral sex had occurred several times, but B.J. did not mention digital penetration or oral sex in the earlier interviews. Haddock also acknowledged that B.J. did not initially tell Haddock about oral sex, and she only mentioned it after Haddock asked her if it had occurred. Although B.J. initially told Haddock that sexual intercourse did not occur on the first morning, B.J. later told her that, on the second morning, her stepfather had sex with her “again.” (R. 487.)
Haddock testified that she was not aware that a few days before B.J. made the September 2009 allegations, B.J.’s parents had gone to juvenile court and that charges had been filed against B.J.
After the State presented its ease Nay-lor moved for a judgment of acquittal, which the trial court denied. Naylor then filed a motion requesting the court to require the State to make an election as to which specific act of which incident it was relying on to establish the various charges. The trial court granted the motion. The State then indicated that, as to count 1 and count 2, charging first-degree rape and second-degree rape, respectively, it was referring to the incident of intercourse that took place in the living room during the evening. The State said that count 3 and count 4 related to the events that took place in BJ.’s bedroom the following morning, after the living-room incident. Count 7 and count 8, the sodomy charges, the State said, related to the first morning B.J. was assaulted in her bedroom, when she noticed the clock at 4:24 a.m. The State acknowledged that jeopardy had attached, and that there would be no additional prosecutions of Naylor for any actions that had been testified to during the trial. The trial court stated that it would have to give a unanimity charge to the jury so that if the jury was convinced beyond a reasonable doubt that deviate sexual intercourse had occurred at some time other than during the morning of the first assault, the jury could not convict Naylor of deviate sexual intercourse. Defense counsel then noted that he had made a pretrial motion requiring the State to elect the incidents on which its charges had relied, and the trial court had denied the motion and that, as a result, the State had been permitted to introduce testimony about multiple additional acts of abuse other than those it had later specifically elected. Defense counsel asked the court to strike the additional evidence of other acts and to instruct the jury not to consider that testimony. The trial court denied that motion, but agreed to give a limiting instruction to the jury and inform the jury that it could not consider the additional testimony as evidence of Naylor’s guilt for the charged events.
The defense called Inv. Agee, who testified that he had arrested Naylor only for the three acts of forced intercourse that had allegedly occurred on consecutive mornings in B.J.’s bedroom. Inv. Agee testified that, although he had read the report prepared following B.J.’s interview at the child-advocacy center and he had information that there might have been support for additional charges, he arrested Naylor only for rape, based on B.J.’s initial report to him.
Naylor testified in his own defense. He testified that he married Melanie in July 2001, and that B.J. was eight years old *1073 when they married. He said he had a good relationship with B.J. He said that Melanie and B.J. were already in counseling when he met them and that he sometimes attended the ongoing counseling sessions, as did Mr. J. and Mr. J.’s wife. Naylor testified that his pickup truck was vandalized with paint, a hammer, and a baseball bat on April 12, 2008, approximately one week after he had purchased it and before the alleged rapes occurred. He did not know until he came to trial that B.J. had vandalized his truck, he said.
Naylor said that he was unaware that B.J. had made any allegation of sexual abuse before September 2009, on the day B.J. went to live with her father. When he came home from work that day Melanie told him that B.J. had told her father that Naylor had raped her.
Naylor said that he. bought a Honda Civic automobile in August 2009 and that B.J. had wanted that car, but he told her that he had bought her first car and that he would not buy another for her. B.J. had a serious accident in her car in September 2009, and she wanted Naylor to give her another car; he refused. He said that soon after he refused her request, B.J. went to live with her father. Naylor testified that Mr. J. gave her a car when she recovered from her neck injuries sustained in the September 2009 accident.
Naylor denied all the charges against him and said he had never had any kind of sexual contact with B.J., at anytime or anyplace.
Naylor said that he replaced the door and the threshold to B.J.’s bedroom in late summer of 2008, after B.J. had kicked the door down. The new door did not come with a knob, he said, and a few days after he replaced the door Melanie purchased a keyed lock for it. Naylor said that the lock on the door was a result of B.J. “fussing at her mother” about going through her room. (R. 584.)
During deliberations the jury first asked for a clarification of the various counts, and more than an hour later asked for additional instructions on the definition of forcible compulsion. The jury returned verdicts finding Naylor not guilty of counts I, II, III, and VII, and guilty of count IV— rape in the second degree, count VIII— sodomy in the second degree, and count IX — incest.
II.
Naylor raises several claims that, he says, entitle him to a reversal. We need address only one of the claims, however, because we agree with Naylor that reversible error occurred as to that issue.
Naylor argues that the trial court erred when it permitted three witnesses — Inv. Agee, Jennifer Owens, and Monica Haddock — to testify over objection that it was his or her opinion that B.J. was sexually abused by Naylor. He argues that the testimony violated Rule 704, Ala. R. Evid., and that it was improper testimony about the ultimate issue in the case.
“The question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court’s determination on that question will not be reversed except upon a clear showing of abuse of discretion.” Ex parte Loggins, 771 So.2d 1093, 1103 (Ala.2000).
We note at the outset that it is unclear whether Inv. Agee, Owens, or Haddock testified as experts. The State did not proffer any of the witnesses as experts. However, each witness testified about his or her experience with sexual-abuse cases, and when the State asked witnesses about their opinions it referred to each witness’s training and experience, as parties typically do when eliciting opin *1074 ion testimony from expert witnesses. We note, too, that the trial court instructed the jurors that they had heard the testimony of “an expert witness or witnesses,” and it instructed the jurors that they were not required to accept the conclusions or opinions to which the experts had testified. (R. 625-26.) However, as noted, no witness was formally tendered as an expert by the State or accepted as an expert by the trial court. Of course, because the State did not proffer the witnesses as experts, Naylor did not challenge any witness as not being qualified before his or her opinions were given.[2] Because the witnesses were not proffered as experts, we consider their testimony to be that of lay witnesses. See Ex parte Sharp, [Ms. 1080959, Dec. 4, 2009] — So.3d -, -(Ala.2009) (although appellant argued that the trial court had erred in allowing a witness to testify as an expert, the Alabama Supreme Court evaluated the witness’s testimony as a lay witness after noting that the State had not proffered the •witness as an expert).
During redirect examination by the State, Inv. Agee was permitted to testify, after repeated objections by Naylor: “My opinion is she was a victim of sexual assault by her stepdad.” (R. 149.)(Emphasis added.) During direct examination by the State, Owens testified, over objection, “I did believe that [B.J.] was a victim of sexual abuse.” (R. 301.) Monica Haddock testified, also over defense objection, “I feel like she was a victim of a traumatic event, that being sexual abuse that she disclosed.” (R. 472-73.)(Emphasis added.) Before Inv. Agee and Owens testified about their opinions of whether B.J. had been sexually abused, Naylor specifically objected on the ground that the State had not laid the proper foundation for the testimony and that the opinions were based only on their limited interviews with B.J. (R. 143-44, 301-02.) He also objected that a question about Inv. Agee’s opinion was improper because, he said, it invaded the province of the jury. (R. 140.) Before Haddock testified as to her opinion, Naylor objected on the ground that it related to the ultimate issue. (R. 472.)
Naylor argues that testimony from Inv. Agee, Owens, and Haddock was improper because, he argues, it embraced the ultimate issue and violated Rule 704, Ala. R. Evid. He also argues, “Arguably none of the three were properly qualified to testify as to whether or not [B.J.] had been the victim of sexual abuse by the defendant.” (Naylor’s brief, at p. 139.) He argues that their opinions were based only on brief interviews with B.J. Rule 701, Ala. R. Evid., addresses the admissibility of opinion evidence by a lay witness; it provides:
“If the witness is not testifying as an expert, the witness’s testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness’s testimony or the determination of a fact in issue.”
The Advisory Committee’s Notes to Rule 701 state, in relevant part:
*1075 “Traditional common law, including that in Alabama, generally has precluded a lay witness from giving an opinion. The law has required that the witness place all the facts before the trier of fact, thus placing the trier of fact in just as good a position as the witness to draw a conclusion in the matter. Indeed, it has been said that permitting a lay witness to give an opinion preempts the role assigned to the jurors. Boatwright v. State, 351 So.2d 1366 (Ala.1977); C. Gamble, McElroy’s Alabama Evidence § 127.01(2) (4th ed.1991).
“The rule excluding opinion evidence has been under consistent attack through the years. Professor Morgan argued that it merely furnishes the basis for both foolish appeals and foolish reversals. E. Morgan, Basic Problems of Evidence 220 (1963). Dean Wigmore argued for its total abolition. 7 J. Wig-more, Wigmore on Evidence § 1929 (Chadbourn rev.1978). Criticism of this rule finally led to Fed.R.Evid. 701, which vests the trial court with discretion to permit lay witnesses to give opinions but only under certain conditions.
“Alabama Rule of Evidence 701, like its identical counterpart under the Federal Rules of Evidence, permits lay witnesses to give opinions whenever two conditions are met. First, the opinion must be rationally based upon the perception of the witness. This is no more than a restatement of the ‘firsthand knowledge rule,’ found in Ala. R. Evid. 602, tailored to opinions. No lay witness may give an opinion based upon facts that the witness did not personally observe. Second, a lay witness with firsthand knowledge may give an opinion only if it is helpful to a clear understanding of the witness’s testimony or to the determination of a fact in issue. A fair amount of discretion is vested in the trial judge regarding the determination of whether opinions are helpful. It is clear, however, that opinions should be excluded as not being helpful if they are ‘meaningless assertions which amount to little more than choosing up sides.’ Fed.R.Evid. 701 advisory committee’s note. Assertions that one is ‘liable,’ ‘guilty,’ or ‘at fault’ generally would not be helpful and thus would properly be excluded. See United States v. Ness, 665 F.2d 248, 249-50 (8th Cir.1981) (proper to preclude opinion that defendant had no intent to ‘hurt’ the bank from which he allegedly misappropriated funds); United States v. Bashes, 649 F.2d 471, 478 (7th Cir.1980), cert. denied, 450 U.S. 1000 (1981) (holding it not helpful for a witness to be allowed to testify that conduct was ‘unlawful’ or ‘wilful’); Scheib v. Williams-McWilliams Co., 628 F.2d 509, 511 (5th Cir.1980) (trial court did not abuse its discretion by precluding lay opinion that a dredge tender was ‘dangerous’).”
In Ex parte Jackson, 68 So.3d 211 (Ala.2010), the Alabama Supreme Court addressed a portion of the Committee Comments to Rule 701, Ala. R. Evid. In that case, Jackson argued that the victim’s mother had been permitted to testify about her opinion of his guilt, even though she had no personal knowledge of the identity of the perpetrators. The Alabama Supreme Court agreed with Jackson, and held:
“Such testimony from a lay witness was clearly inadmissible. Rule 701, Ala. R. Evid., provides, in pertinent part, that a lay ‘witness’s testimony in the form of opinions or inferences is limited to those opinions and inferences which are ... rationally based on the perception of the witness.’ ‘The Advisory Committee’s Notes on [this] portion of Rule 701 ... indicate that “[t]his is no more than a *1076 restatement of the ‘firsthand knowledge rule,’ found in Ala. R. Evid. 602, tailored to opinions. No lay witness may give an opinion based upon facts that the witness did not actually observe.’” Musgrove Constr., Inc. v. Malley, 912 So.2d 227, 239-40 (Ala.Civ.App.2003). See also Lewis v. State, 889 So.2d 623, 646 (Ala.Crim.App.2003).”
68 So.3d at 215 (footnote omitted).
Inv. Agee, Owens, and Haddock testified as lay witnesses, and they had no firsthand knowledge of whether B.J. was sexually abused by Naylor. Therefore, their opinion testimony should have been excluded, whether or not that testimony concerned the ultimate issue. Ex parte Jackson, 68 So.3d at 215-16. The trial court’s admission of their opinion testimony constituted an abuse of discretion for this reason.
We note, furthermore, that the testimony from Inv. Agee and Haddock embraced the ultimate issue. “An ultimate issue has been defined as the last question that must be determined by the jury. See Black’s Law Dictionary (5th ed.1991).” Tims v. State, 711 So.2d 1118, 1125 (Ala.Crim.App.1997). Rule 704, Ala. R. Evid., states: “Testimony in the form of an opinion or inference otherwise admissible is to be excluded if it embraces an ultimate issue to be decided by the trier of fact.” The Advisory Committee’s Notes to Rule 704 explain that “[t]he basis for the preclusion is the fear that the admission of such an opinion will preempt the role and function of the factfinder.” Therefore, even if Inv. Agee and Haddock testified as experts, the trial court erred when it permitted their ultimate-issue testimony that Naylor had sexually abused B.J.[3] The State concedes that Inv. Agee’s testimony embraced the ultimate issue. (State’s brief, at pp. 59-60.) However, the State argues, incorrectly, that Haddock did not testify about whether Naylor was the perpetrator of the sexual abuse she believed B.J. had suffered. Haddock clearly testified that she believed that B.J. had been the victim of the “sexual abuse that she disclosed.” (R. 472-73.) (Emphasis added.) B.J. never alleged that anyone other than Naylor had sexually abused her; therefore, Haddock’s testimony clearly implicated Naylor as the perpetrator of B.J.’s abuse, and that testimony, too, embraced the ultimate issue. Sanders v. State, 986 So.2d 1230, 1232 (Ala.Crim.App.2007) (“[T]he ultimate issue in similar cases is whether the defendant had sexually abused the child, not whether the child had in fact been sexually abused.”); Kennedy v. State, 929 So.2d 515 (Ala.Crim.App.2005) (the fact at issue was whether Kennedy was responsible for the victim’s abuse); Sexton v. State, 529 So.2d 1041, 1048 (Ala.Crim.App.1988) (“The ultimate fact in issue, however, was whether the defendant raped and sodomized the child....”).
Contrary to the State’s contention that the three witnesses were all “able to gauge the credibility and sincerity of the minor victims they are charged to protect,” (State’s brief, at p. 60), the testimony from Inv. Agee and Haddock gave unwarranted and legally impermissible stamps of approval to B.J.’s allegations that Naylor had sexually abused her, and thus usurped the jury’s function to decide the ultimate issue. Therefore, even if Inv. Agee and Haddock had testified as experts, their testimony invaded the province of the jury in that they expressed impermissible opinions on the ultimate fact in issue — whether Naylor had sexually abused B.J. The trial court abused its considerable discretion when it permitted the witnesses’ testimony.
*1077 ni.
Although 'we find that the trial court erred when it permitted Inv. Agee and Monica Haddock to testify regarding the ultimate issue, our inquiry does not end there. The harmless-error rule provides, in pertinent part:
“No judgment may be reversed or set aside ... on the ground of ... improper admission or rejection of evidence, nor for error as to any matter of pleading or procedure, unless in the opinion of the court to which the appeal is taken or application is made, after examination of the entire cause, it should appear that the error complained of has probably injuriously affected substantial rights of the parties.”
Rule 45, Ala. R.App. P. See also Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).
In Ex parte Crymes, 630 So.2d 125 (Ala.1993), the Alabama Supreme Court stated:
“In determining whether the admission of improper testimony is reversible error, this Court has stated that the reviewing court must determine whether the ‘improper admission of the evidence ... might have adversely affected the defendant’s right to a fair trial,’ and before the reviewing court can affirm a judgment based upon the ‘harmless error’ rule, that court must find conclusively that the trial court’s error did not affect the outcome of the trial or otherwise prejudice a substantial right of the defendant.”
630 So.2d at 126. See also Ex parte Greathouse, 624 So.2d 208, 210 (Ala.1993) (holding that the proper harmless-error inquiry is whether it is clear beyond a reasonable doubt that the jury would have returned a verdict of guilty absent the improperly introduced evidence).
Here, considering the record as a whole, we cannot conclude that the errors in the admission of the testimony were harmless. The evidence of Naylor’s guilt of the three charges of which he was convicted was far from overwhelming. There was no physical evidence connecting Nay-lor to the crimes. B.J.’s allegations regarding the assaults varied on significant details, as we have fully discussed in the initial portion of this opinion, including her statements about in which rooms of the house the assaults occurred, the time of day they occurred, whether anyone else was nearby or even awake when they occurred, and what acts Naylor had allegedly performed on each of those occasions. Defense counsel thoroughly cross-examined B.J., Melanie, Inv. Agee, Owens, and Haddock about the inconsistencies; he also thoroughly cross-examined Inv. Agee, Owens, and Haddock regarding their failure to ask B.J. about those inconsistencies. Following defense counsel’s thorough cross-examination of Inv. Agee, the State on redirect examination sought primarily to elicit from the investigator testimony that he believed B.J.’s allegations; redirect examination ended with Inv. Agee testifying, “My opinion is she was a victim of sexual assault by her stepdad.” (R. 149.)
Defense counsel also presented substantial evidence that B.J. had behavioral issues before the alleged incidents occurred, including testimony that B.J. had a longstanding desire for her parents to be reunited and she was angry that her parents were not together, and that B.J. had taken an overdose of pills and engaged in cutting behavior before these events were alleged to have occurred. Defense counsel also presented substantial evidence of B.J.’s history of lying — including the fact that, shortly before B.J. made these allegations, she had lied to her father about Naylor striking her, a fact she admitted at trial. B.J.’s mother initially told authorities that she did not believe B.J.’s allegations. De *1078 fense counsel also elicited evidence that B.J. was angry that her mother was actually going to make her move out of the house and live with Mr. J., when her mother had not previously enforced her threats to do so. Defense counsel established that B.J. was angry with Naylor before she made these allegations because he had refused to give her another car after she wrecked the car he had purchased for her.
Moreover, the jury acquitted Naylor of the most serious charges against him, indicating that they did not find B.J.’s testimony completely credible.
A review of the entire case makes it clear that a determination of B.J.’s credibility and the truth of her various allegations were the keys to determining Nay-lor’s guilt or innocence, and Inv. Agee and Haddock testified directly to that issue, both stating they relied on their experience and knowledge in testifying that they believed that Naylor had sexually abused B.J. If the improperly admitted evidence had been excluded, the jury would have been presented with the opposing testimony of B.J. and Naylor and, because the jury already rejected a majority of the charges that were based on B.J.’s allegations, it might have also found Naylor’s version to be more credible and acquitted him of all charges. It is also possible that, without the improper testimony supporting B.J.’s credibility that Inv. Agee and Haddock provided, the jury would have been unable to agree on Naylor’s guilt as to the remaining charges and might have been deadlocked, requiring a mistrial on those counts. We simply cannot ignore the prejudicial effect of the erroneously admitted testimony, and we cannot hold that the testimony did not affect the outcome of the trial or otherwise prejudice Naylor’s substantial rights. To the contrary, we think it is highly probable that the errors had a substantial and injurious effect on Naylor’s substantial rights and that they affected the outcome of the trial.
We are fully conscious of the important — and sometimes competing — societal interests in finality and fundamental fairness, and we do not lightly overturn criminal convictions. We also have regard for the discretion a trial court has in deciding the admissibility of the evidence and for our duty to apply the harmless-error rule. However, even with the deference that is due, in this case, with evidence of guilt that is far from overwhelming and verdicts of questionable validity, we must honor our obligation to ensure the fairness of all criminal prosecutions. To do otherwise increases the possibilities for the miscarriage of justice for all other individuals.
Based on the foregoing, the judgment of the circuit court is reversed, and the cause is remanded for a new trial or for other proceedings consistent with this opinion.
REVERSED AND REMANDED.
WINDOM, P.J., and KELLUM and BURKE, JJ., concur. JOINER, J., concurs in the result.

. B.J.’s father has the same initials as B.J., so in this opinion we will refer to B.J.’s father as “Mr. J."

. After the State conducted its direct examination of Jennifer Owens, defense counsel objected to the State’s "qualification of the witness as an expert after he’s put on testimony relating to her opinion,” and the trial court stated that the objection was untimely. (R. 302.) Owens had completed her testimony by stating that she had testified in that circuit court as a witness in sexual abuse cases in which children were involved and that she had testified as an expert in that regard. (R. 301-02.) Owens’s testimony that she had testified in prior cases as an expert did not constitute a proffer of Owens as an expert witness in this case and, as noted above, the trial court did not accept Owens as an expert.

. Owens did not opine that Naylor was the perpetrator of B.J.'s abuse.