[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1120 
The appellant, John Wendell Tims, was convicted of one count of murder, two counts of assault in the second degree, and seven counts of assault in the third degree. He was sentenced to 12 years' imprisonment for the murder count, to 5 years' imprisonment for each count of assault in the second degree, and to 1 year's imprisonment for each count of assault in the third degree. All the sentences were to run concurrently.
 I.
The appellant contends that the evidence was not sufficient to support his conviction for murder.
The appellant was charged with, and was convicted of, violating § 13A-6-2(a)(2), Ala. Code 1975, which provides that [a] person commits the crime of murder if . . . [u]nder circumstances manifesting extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to a person other than himself, and thereby causes the death of another person." In arguing that there was insufficient evidence to support the murder conviction, the appellant contends that the state failed to prove that he acted recklessly, with extreme indifference to human life.
 "In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution. Faircloth v. State, 471 So.2d 485 (Ala.Cr.App. 1984), aff'd, 471 So.2d 493 (Ala. 1985). Furthermore, a judgment of conviction will not be set aside on the ground of insufficiency of the evidence unless, allowing all reasonable presumptions for its correctness, the preponderance of the evidence against the judgment is so decided as to clearly convince the reviewing court that it was wrong and unjust. Jackson v. State, 516 So.2d 726 (Ala.Cr.App. 1985)."
Powe v. State, 597 So.2d 721, 724 (Ala. 1991). Circumstantial evidence must be accorded the same weight as direct evidence.Linzy v. State, 455 So.2d 260, 262 (Ala.Cr.App. 1984).
The evidence presented by the state tended to show the following: At about 11:00 a.m. on August 12, 1995, an automobile driven by the appellant collided with a van driven by Gwendolyn Grady near the George Wallace Tunnel in Mobile. There were 10 occupants in the van at the time of the collision. One occupant of Grady's van was killed as a result of the collision. Two other occupants of the van sustained serious physical injuries, *Page 1121 
and seven occupants, including Grady, sustained less severe injuries. The appellant and a passenger in his automobile were also injured. Leonard Blanchard, an eyewitness to the events, testified that shortly before the collision, he was driving west on Interstate 10, just east of the George Wallace Tunnel, when he observed the appellant also driving west on I-10. Blanchard stated that the appellant appeared to be engaged in an animated argument with the passenger in his car and that he was looking at his passenger instead of the road. According to Blanchard, the appellant was driving erratically, weaving constantly and nearly hitting the wall at the entrance to the tunnel. Blanchard stated that once inside the tunnel, he slowed his own vehicle down in order to put some distance between himself and the appellant's car. He testified that the appellant's vehicle did not appear to be speeding or weaving while he was in the tunnel. However, just after exiting the west end of the tunnel, Blanchard said, the appellant accelerated his vehicle to approximately 70 miles per hour and again began to weave from lane to lane. The speed limit on this stretch of road was 55 miles per hour. Still apparently arguing with his passenger, the appellant crossed into the lane occupied by Grady's van and collided with her van a short distance beyond the west end of the tunnel. Both vehicles flipped several times.
Martha Ludgood, another eyewitness to the collision, testified that she saw the appellant's vehicle weaving between lanes and moving from the far left lane to the far right lane before hitting Grady's van. Ludgood stated that Grady's van appeared to be driving straight in its own lane of traffic at the time of the collision.
In the aftermath of the collision, the appellant was treated by emergency personnel at the scene and was then transported to a hospital. Larry Hearn, an accident investigator for the Mobile Police Department, testified that he saw two empty beer cans and four unopened beer cans inside the appellant's vehicle following the crash. Hearn stated that the appellant smelled of alcohol at the scene.
Arthur Campbell, a paramedic at the crash scene; Dr. John M. McMahon, Jr., the appellant's emergency room physician; and Fred Phelps, a registered nurse who tended to the appellant at the hospital, all testified that the appellant smelled of alcohol when they treated him and all testified that the appellant appeared to be under the influence of alcohol. Dr. McMahon testified that while he was treating the appellant after his arrival at the hospital, the appellant said, "I guess I really screwed up this time."
Dixie Sue Smith, a medical technologist at the hospital, testified that she performed a blood alcohol test on the appellant's blood plasma after blood was drawn from the appellant by Linda Risk, a phlebotomist at the hospital. Smith testified that after separating the appellant's blood in a centrifuge, she tested the blood plasma for alcohol content using an ACA-4 "chemistry analyzer" and found the appellant's blood plasma alcohol level to be .298% "by dilution," indicating "a great deal of alcohol [was] present." (R. 157.) The blood sample was drawn from the appellant approximately an hour and 15 minutes after the crash.
From the state's evidence — which tended to show that, at the time of the collision, the appellant was intoxicated and was operating his vehicle heedlessly and erratically and at an excessive speed — the jury could reasonably find that the appellant recklessly engaged in dangerous conduct under circumstances manifesting an extreme indifference to human life and that he thereby caused the death of another person. SeeAllen v. State, 611 So.2d 1188 (Ala.Cr.App. 1992); Weaver v.State, 591 So.2d 535 (Ala.Cr.App. 1991); Patterson v. State,518 So.2d 809 (Ala.Cr.App. 1987); Lofton v. State, 515 So.2d 137
(Ala.Cr.App. 1987). "[Section] 13A-6-2(a)(2) 'embrace[s] those homicides caused by . . . driving an automobile in a grosslywanton manner.' " Allen, 611 So.2d at 1190, quoting Northingtonv. State, 413 So.2d 1169, 1172 (Ala.Cr.App. 1981) (emphasis in Allen). Based on our review of the evidence in a light most favorable to the prosecution, we find that sufficient evidence was presented by the state to submit the case to a jury on the charge of murder under § 13A-6-2(a)(2). *Page 1122 
Absent clear and convincing evidence to the contrary, this court will not reverse a jury's determination. Hoobler v.State, 668 So.2d 905 (Ala.Cr.App. 1995). This case does not present such a situation.
 II.
The appellant contends that the hospital records containing the results of the blood alcohol test administered by hospital personnel were effectively "seized" by the state, in violation, he says, of his Fourth Amendment rights, and that, therefore, those records were improperly admitted into evidence. The appellant argues that the state was required to, but did not, obtain a judicially approved warrant for the seizure of the hospital records and that the state's acquisition of the hospital records pursuant to a subpoena duces tecum[1] issued to the hospital amounted to an illegal seizure.
The test for determining whether a person has a protected Fourth Amendment privacy interest is whether that person has a reasonable expectation of privacy in the area invaded by the government. Katz v. United States, 389 U.S. 347,88 S.Ct. 507, 19 L.Ed.2d 576 (1967). "[A] subjective expectation of privacy does not, by itself, give rise to Fourth Amendment protection. The expectation of privacy must be one that society is prepared to recognize as reasonable." Chandler v. State,680 So.2d 1018, 1022 (Ala.Cr.App. 1996). "[T]he concept of an interest in privacy that society is prepared to recognize as reasonable is, by its very nature, critically different from the mere expectation, however well justified, that certain facts will not come to the attention of the authorities."United States v. Jacobsen, 466 U.S. 109, 122, 104 S.Ct. 1652,1661, 80 L.Ed.2d 85 (1984). We do not believe that the appellant had a reasonable expectation of privacy in the hospital records relating to his blood alcohol test.[2]
Although not dispositive of this issue, the Alabama legislature apparently does not recognize as reasonable an expectation of privacy in all medical records. For instance, although the legislature has adopted a psychotherapist-patient privilege, see § 34-26-2, Ala. Code 1975, there is no Alabama statute that provides for a general physician-patient privilege. "There is no privilege in Alabama covering communications between a physician and a patient or the physician's knowledge of the patient's condition acquired by reason of the relationship. It customarily is phrased that communications to a physician or surgeon by a patient or one seeking professional advice are not privileged under common law and no such privilege exists in Alabama, absent a statute creating it." C. Gamble, McElroy's Alabama Evidence, § 413.01 at 1677 (5th ed. 1996) (footnotes omitted); see Rule 503, Ala.R.Evid. (recognizing only psychotherapist-patient privilege).
It is also apparent that the Alabama legislature does not recognize as reasonable an expectation of privacy in the results of blood alcohol tests as a particular kind of medical record. Under Alabama's implied consent law, any person operating a motor vehicle upon the state's highways who has been lawfully arrested for an offense arising out of acts alleged to have been committed while the person was driving under the influence of alcohol is "deemed to have given his consent" to testing of his blood for purposes of determining its alcoholic content. § 32-5-192(a), Ala. Code 1975. Pursuant to § 32-5A-194(a), Ala. Code 1975,[3] the evidence derived from *Page 1123 
blood alcohol testing conducted under these circumstances "shall be admissible" in a civil or criminal proceeding arising out of acts alleged to have been committed while a person was driving under the influence.
Like the legislature, the Alabama courts have not recognized a general physician-patient privilege. See Ex parteUnited Service Stations, Inc., 628 So.2d 501 (Ala. 1993); Norrisv. State, 601 So.2d 1105 (Ala.Cr.App. 1991); Duncan v. State,473 So.2d 1203 (Ala.Cr.App. 1985); Arthers v. State,459 So.2d 972 (Ala.Cr.App. 1984). Although the Alabama Supreme Court, inHorne v. Patton, 291 Ala. 701, 287 So.2d 824 (1973), cited by the appellant in his brief to this court, held that a confidential relationship exists between physician and patient imposing a duty on the physician not to freely disclose information obtained from a patient, and that in some instances the unauthorized disclosure of information concerning a patient's medical record might constitute an invasion of the patient's right of privacy, the Alabama Supreme Court also recognized that the physician's duty not to disclose "is, of course, . . . subject to exceptions prompted by the supervening interests of society, as well as the private interests of the patient himself." Horne, 287 So.2d at 830. Certainly, there is a strong societal interest in curtailing drunken driving, and that interest is furthered by allowing prosecutors access to the results of blood alcohol tests administered by trained medical personnel in the wake of automobile accidents where alcohol is suspected to be a contributing factor. The issue inHorne, moreover, was not the constitutional rights of a criminal defendant; Horne was a civil case that recognized the contractual relationship between physician and patient and also recognized the legal basis for a cause of action, under a theory of tortious invasion of privacy, against a physician by a patient who experienced mental suffering, shame, or humiliation because of the physician's unwarranted disclosure of the details of the patient's health. Simply put, the "right of privacy" recognized by the Supreme Court in Horne is not one of constitutional proportions and is unlike the reasonable expectation of privacy protected by the Fourth Amendment.
We hold that any expectation of privacy that the appellant may have had in the hospital records containing the results of his blood alcohol test was unreasonable in view of the absence of any general physician-patient privilege, in view of the implied consent law and other statutory law granting prosecutors access to such blood alcohol test results and providing for the admissibility of blood alcohol test results in judicial proceedings where certain conditions have been met, and in view of society's strong interest in curtailing drunken driving. Because no Fourth Amendment interests were implicated, this case was "governed by the general rule that the issuance of a subpoena to a third party to obtain the records of that party does not violate the rights of a defendant, even if a criminal prosecution is contemplated at the time the subpoena is issued." United States v. Miller,425 U.S. 435, 444, 96 S.Ct. 1619, 1624, 48 L.Ed.2d 71 (1976).
In holding that the appellant had no reasonable expectation of privacy in the hospital records containing the results of his blood alcohol test, this court bases much of its reasoning on People v. Perlos, 436 Mich. 305, 462 N.W.2d 310
(1990), a case involving several defendants who had been drivers in automobile accidents and who had been taken to the hospital and subjected to blood tests for medical reasons. Hospital personnel subsequently disclosed the results of those tests to prosecutors upon the prosecutors' request and without issuance of warrants, so that the prosecutors could use the test results in criminal prosecutions charging the defendants with driving under the influence of alcohol. In finding that the defendants had no protected Fourth Amendment privacy right in the hospital records containing their blood alcohol test results, the Michigan Supreme Court relied in part on the United States Supreme Court's decision in Miller, supra,425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71, wherein the Supreme Court held that a defendant who had been charged with various federal offenses had no protected Fourth Amendment privacy interest in the bank records of two banks relating to his own transactions and accounts and that, therefore, federal agents had lawfully obtained *Page 1124 
the bank records by means of a subpoena and without a warrant. In agreeing with the rationale of Miller and applying it to blood alcohol test results, the court in Perlos stated:
 "[T]here is no objectively reasonable expectation of privacy in the test results. Clearly, defendants cannot claim ownership or possession of the results. Also, as stated in Miller, information revealed to a third party, even for a limited purpose, can properly be conveyed to the government even if the information was revealed in confidence. In these cases, blood was taken for a limited purpose, medical treatment. As in Miller,. . . the information conveyed was not privileged. Under the Miller analysis, once the hospitals obtained the results for medical purposes, it would have been unreasonable for defendants to assume that the results would necessarily remain private. At the very least, various hospital employees become aware of the test results in the normal course of their work. Society places a risk on persons in their dealing with third parties that information conveyed to third parties will not remain private."
Perlos, 462 N.W.2d at 321 (footnotes omitted). See also decisions of other state courts reaching similar conclusions, e.g., State v. Dyal, 97 N.J. 229, 478 A.2d 390 (1984); Pollardv. State, 439 N.E.2d 177 (Ind.App. 1982); and State v. Jenkins,80 Wis.2d 426, 259 N.W.2d 109 (1977).
The appellant's Fourth Amendment rights were not violated when the state subpoenaed and acquired the hospital records containing the results of the blood alcohol test.
 III.
The appellant further contends that the statutory predicate set out in § 32-5A-194(a), Ala. Code 1975, for the admission of evidence of his blood alcohol content was not met. Section32-5A-194(a) sets forth provisions for admission in evidence of the results of a blood alcohol test performed at the direction of law enforcement officers and other governmental entities pursuant to the implied consent law, § 32-5-192(a), Ala. Code 1975. The appellant specifically argues that the test results were inadmissible because, he says, the blood test was not conducted in accordance with the methods approved by the Department of Forensic Sciences.
In Russo v. State, 610 So.2d 1206, 1207 (Ala.Cr.App. 1992), this court stated that "the implied consent law and § 32-5A-194
are not 'the exclusive means for admitting intoxication test results.' " This court further recognized that " 'where the blood is seized only for medical purposes and not in furtherance of a criminal or accident investigation,' the results of a blood alcohol test are admissible under general evidentiary principles." Id. See Ex parte Radford,557 So.2d 1288, 1291 (Ala. 1990). These principles do not require that persons involved in the test process conduct the test in accordance with methods approved by the Department of Forensic Sciences. Russo, 610 So.2d at 1208. Here, the state did not seek to introduce the results of the blood test under the implied consent law, but rather under general evidentiary principles; therefore, if the state laid a proper predicate under these principles, the evidence of the appellant's blood alcohol test results was admissible. See Ex parte Mayo,652 So.2d 201 (Ala. 1994) (in DUI case, blood alcohol test results are admissible under statutory predicate in § 32-5A-194 or
under general evidentiary principles).
At the appellant's trial, testimony was presented by the attending emergency room physician, by the phlebotomist who drew the appellant's blood, and by the medical technologist who performed the test on the appellant's blood plasma that the blood test was performed on the appellant to determine the extent of his injuries. The phlebotomist, Linda Risk, testified that she drew the appellant's blood, labeled it, and sent it to the hospital lab for analysis by the medical technologist, Dixie Sue Smith. In her testimony, Smith explained the procedures she used in performing the blood alcohol analysis of the appellant's blood plasma and how the test results were interpreted. She further testified that she had gone through procedures to test the accuracy and verifiability of the machine used to analyze the appellant's blood plasma. Her testimony also established that the analysis was done according to accepted *Page 1125 
medical and scientific standards. The state also established the chain of custody of the appellant's blood plasma through the point of its analysis. After our review of the record, we find that the state laid a proper predicate for admission of the results of the blood alcohol test according to general evidentiary principles. There was no error in the trial court's admission of the blood alcohol evidence.
 IV.
The appellant contends that the question of his intoxication was the "ultimate issue" in his case and that, therefore, the trial court erred in denying his motion to suppress any opinion testimony concerning the question of his intoxication. At trial, the appellant based his objection to testimony concerning the question of his intoxication upon Rule 704, Ala.R.Evid., which provides that "[t]estimony in the form of an opinion or inference otherwise admissible is to be excluded if it embraces an ultimate issue to be decided by the trier of fact."
An ultimate issue has been defined as the last question that must be determined by the jury. See Black's Law Dictionary
(5th ed. 1991). The appellant was convicted of murder, assault in the second degree, and assault in the third degree. See §§13A-6-2(a)(2), 13A-6-21(a)(3), and 13A-6-22(a)(2), Ala. Code 1975. All charges contained reckless conduct as an element. Therefore, the ultimate issue for the jury was whether the appellant's conduct was reckless. With specific reference to the murder charge, the jury also had to determine whether the appellant's conduct manifested an extreme indifference to human life. See § 13A-6-2(a)(2) and Allen, 611 So.2d at 1190. While the state's proof of the appellant's recklessness and his extreme indifference to human life included evidence of his intoxication, it also included evidence of his other actions (e.g., that he was operating his vehicle at an excessive speed and heedlessly and erratically). "The fact that a defendant had been drinking before an accident is just one further circumstance to prove that he possessed an extreme indifference to human life." Jordan v. State, 486 So.2d 482, 484
(Ala.Cr.App. 1985), aff'd, 486 So.2d 485 (1986), quoted inAllen, 611 So.2d at 1192. Whether the appellant was intoxicated at the time of the accident was not the ultimate issue in this case.
We note, moreover, that even where intoxication has been deemed to be an ultimate issue in a legal proceeding, prior Alabama caselaw has permitted witnesses to give opinion testimony as to this issue. See Reuther v. City of Leeds,599 So.2d 1246, 1248-49 (Ala.Cr.App. 1992); Malone v. City ofSilverhill, 575 So.2d 101 (Ala.Cr.App. 1989), rev'd on other grounds, 575 So.2d 106 (Ala. 1990); Jolly v. State,395 So.2d 1135, 1143 (Ala.Cr.App. 1981); Burke v. Tidwell, 211 Ala. 673,101 So. 599 (1924). Despite the apparent injunction against "ultimate issue" testimony in the text of Rule 704, Ala.R.Evid., the advisory committee's notes to Rule 704 provide: "There is no intent that adoption of Rule 704 should abrogate preexisting case law liberalizing the application of the ultimate issue rule." Cited in Wilkerson v. State,686 So.2d 1266, 1279 n. 2 (Ala.Cr.App. 1996). The trial court did not err in denying the appellant's motion to suppress testimony as to the question of his intoxication.
The judgment of the trial court is affirmed.
AFFIRMED.
All the Judges concur.
[1] Section 12-21-6, Ala. Code 1975, sets out the procedure for obtaining hospital records through the issuance of a subpoena duces tecum.
[2] No Fourth Amendment interests were implicated in the initial withdrawal of the blood sample from the appellant for testing by hospital personnel. Testimony established that the removal of blood from the appellant and the testing of his blood were ordered and performed by medical personnel solely for purposes of medical diagnosis and treatment. Because there was no state involvement in the withdrawal and testing, there was no seizure. Ex parte Radford, 557 So.2d 1288, 1291 (Ala. 1990). SeeSchmerber v. California, 384 U.S. 757, 86 S.Ct. 1826,16 L.Ed.2d 908 (1966), and United States v. Jacobsen,466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984).
[3] We recognize that only blood alcohol test results obtained at the direction of law enforcement officials are subject to the implied consent law and that the appellant's blood alcohol test was ordered not by law enforcement officials, but by medical personnel.