WELCH, Judge.
Stephen Jay Naquin[1] appeals from his convictions for first-degree rape, see § 13A-6-61(a)(2), Ala.Code 1975, and second-degree rape, see § 13A-6-62(a)(l) (statutory rape), Ala.Code 1975. For each conviction, Naquin was sentenced to 10 years in prison. The sentences are to be served concurrently. He was also ordered to pay $50 to the Alabama Crime Victims Compensation Fund and to pay court costs.
The allegations underlying the two charges were that on October 21, 2007, Naquin, who was then 29 years old, had sexual intercourse with J.R., the female victim, who was 15 years old. J.R. was unconscious at the time and thus incapable of consent by reason of physical helplessness or mental incapacitation, (§ 13A-6-61(a)(2), Ala.Code 1975).
On the night of October 20, 2007, Na-quin and six children camped out in the woods. The children were J.R., the victim; “B.J.,” the victim’s boyfriend, who was 15 years old; C.H., a female who was 14 or 15 years old; C.H.’s brother, J.H., who was 12 years old; W.D.C., a male who was 16 years old; and W.D.C.’s male cousin, R.N., whose age was not disclosed in the record. J.R., C.H., W.D.C., and Naquin testified at trial.
Testimony was presented that almost everyone present at the campout consumed alcoholic beverages and took Soma and/or Lortab tablets. The evidence was conflicting regarding whether Naquin provided the alcohol and drugs to the minors.
The 'victim testified that after going to the county fair in the afternoon, the group reached the campsite at about 7:30 p.m. The victim stated that she drank a 64-ounce drink of Jagermeister liqueur and ice and also drank beer; the drinks were provided by Naquin. She said she did not remember taking any pills. At some point during the evening she passed out; after that, she does not know what happened. The victim said that for a week after the campout she was sick and could not think clearly. She testified that at the time of the campout B.J. was her boyfriend but that she had never had sex. The victim was asked if she recalled telling someone that she wanted to have sex with Naquin the night of the campout; she answered *986 that she did not. She stated that she did not want to have sex with Naquin.
C.H. testified that she joined the group after the group had been to the fair. C.H. testified that W.D.C. had asked Naquin to go on the campout to provide adult supervision. She stated that the victim was drinking a frozen (i.e., “slushy” (R. 84.)) Jagermeister, an alcoholic beverage, from a 44-ounce cup when the group arrived at C.H.’s house to get C.H. and J.H. to go camping. C.H. testified that Naquin had a Crown Royal brand whiskey cloth bag full of pills. She stated that Naquin gave her and the victim two or three pills and that they both swallowed the pills. When C.H. woke up the next morning, she saw Na-quin lying on top of the victim. She said that she did not actually see them having sex, but neither the victim nor Naquin was wearing pants. C.H. said that the victim was passed out at the time. When Naquin got up, he had to pull up his pants. C.H. stated that the victim had to be picked up from the ground. She said the victim was not responsive and did not know what was going on or why her friends were “freaking out.” (R. 79.) The victim had to be lifted into the car. C.H. said the police were called. C.H. said taking the pills did not affect her the next day.
W.D.C. testified that during part of the evening of the campout, the victim and B.J. were by themselves away from the campsite. He stated that he, C.H., R.N., and J.H. slept in the cab of Naquin’s truck. B.J. and the victim were sleeping beside one another outside by the fire, and Na-quin was sleeping outside away from the fire. W.D.C. woke up early on the morning of October 21, 2007, and saw the victim’s clothes tossed “all over the place,” and he saw Naquin lying on top of the victim, who was naked, with his pants down, having sex with her. (R. 155.) He testified on direct examination that he could not “quite” tell where Naquin’s penis was, but his penis was “inside of [the victim] somewhere.” (R. 152.) On cross-examination, W.D.C. admitted that his testimony conflicted with a statement he had given to the police shortly after the alleged rape. In that statement, W.D.C. stated that when he woke up and saw Naquin, Naquin was wearing boxer shorts and he was lying on top of the victim, who was wearing a shirt. He stated on redirect examination that whatever Naquin was wearing, W.D.C. saw him laying on top of the victim “with his self inside of her.” (R. 183.) On re-cross-examination, the defendant challenged W.D.C.’s ability to state where Naquin’s penis was; however, W.D.C. continued to assert that Naquin was having sex with the victim. W.D.C. stated that, upon seeing Naquin having sex with the victim, he grabbed a knife and ran toward Naquin and Naquin stood up and started pulling his pants on and running toward W.D.C. The victim stood up and “her girl part” was “inflamed and red and she was running off’ from the campsite clearing toward the woods. (R. 153.) C.H. got the victim to the car. W.D.C. called emergency 911.
Naquin testified that he lived with W.D.C. and W.D.C.’s mother, that he was R.N.’s uncle, and that R.N. was W.D.C.’s cousin. Naquin stated that W.D.C. did not like him and that just a few days before the camping trip W.D.C. had tried to hit Naquin with a piece of 2 x 4 lumber. Na-quin said that W.D.C. had asked him to go on the camping trip because C.H.’s grandmother would not let her go unless there was adult supervision. Naquin testified that before the campout he heard the victim say to someone that she wanted to have sex with “R.N.’s uncle,” i.e., Naquin. He stated that he went to sleep alone but woke up to find the victim lying on top of him. He kissed her. He did not realize she was naked from the waist down. He did not have sex with her. Naquin testi *987 fied that when W.D.C. ran toward him he stood up, and at that time he saw the victim’s shorts lying close to where she and her boyfriend had gone to sleep. Na-quin stated that he had prescription Soma and Lortab tablets in the cab of his truck. The morning after the campout, he said, all the pills were gone.
The State called Dr. Jessica Kirk to testify. Dr. Kirk is a professor of Pediatrics' at the University of South Alabama. She is a specialist in Child Abuse Pediatrics, which includes the medical care of abused children. She was trained in this field by Dr. John Shriner and had worked several years at the “Sexual Child Abuse and Neglect” (“SCAN”) clinic. When Dr. Shriner retired, Dr. - Kirk took over his medical practice and is the custodian of the medical records of the clinic.
Dr. Kirk reviewed the records from the victim’s examination, which was conducted at the University of South Alabama Hospital emergency room immediately after or not long after the alleged sexual assault occurred. She stated that a Dr. Howard, a general pediatrician, performed the examination. Dr. Howard’s examination disclosed “a bruise or abrasion on the [victim’s] labia externally.” (R. 140). Dr. Kirk could not recall any other findings from Dr. Howard’s examination. These records were not offered at trial. Dr. Kirk stated that following Dr. Howard’s examination, the victim was referred to the SCAN clinic for a complete physical and gynecological examination. (R. 140.) The examination took place on November 29, 2007. Dr. Kirk said that it is normal for a SCAN examination to take place about a month following an alleged sexual assault. (R. 141.)
Dr-. Kirk testified the victim was examined at the SCAN clinic by Dr. Shriner. Because Dr. Shriner was 87 years old at the time of the trial, retired from the practice of medicine, and in poor health, he was unable to attend the trial. Dr. Kirk testified that she had reviewed the victim’s file, which included Dr. Shriner’s “dictated summary, which is a typed summary.... [H]is personal notes that he jotted down, his handwritten notes during the visit when he interviewed the [victim], and ... his hand-drawn drawings of the [victim’s] anatomy.” (R. 131.) She testified that Dr. Shriner examined the victim using a colposcope to ascertain physical injury associated with sexual assault. Dr. Kirk explained that a colposcope is a type of microscope used in a vaginal examination that provides a light source and 16-power magnification; it is much more accurate than the human eye, and “gives ... a lot more detail.” (R. 128.) A colposcope is typically used to examine an alleged victim of sexual abuse months to years after the alleged event. Dr. Kirk was asked to identify the SCAN summary, which was the State’s Exhibit 1. She stated that a SCAN summary is “a report ... kept in the files at the clinic ... at the Children’s and Women’s Hospital” as part of a victim’s “permanent file there.” (R. 133.) It is therefore, “part of the hospital or the clinic record.” (R. 133.) The SCAN summary report is kept in the “regular course of business and may be relied upon in the regular course of [her] medical practice and upon which [she] would rely to make decisions.” (R. 133.) The State moved to introduce the SCAN summary into evidence. Naquin objected on several grounds, including hearsay and the ground that admitting the SCAN summary without affording Naquin an opportunity to cross-examine Dr. Shriner violated the Confrontation Clause. (R. 134.) The trial court overruled the objection, and the SCAN was admitted into evidence.
The State’s Exhibit 1, Dr. Shriner’s “Summary of SCAN Examination” (C. 79), included the following:
*988 “Present Problem: This child was brought to the University of South Alabama SCAN Clinic Outpatient services by her father. The history was obtained from her grandfather. He stated that this child was with a group of children about a month ago, and they had been to the fair and had a picnic with a bonfire. He states that he does not believe any alcohol was used or involved. A 29-year-old uncle of one of her friends apparently took the child off and had sex with her.
“History from Child: ... [The victim] stated that about a month ago, she was with a group of friends and they had been to a fair and then had a kind of picnic. She said the uncle (Steven J. [Naquin] age 29) of one of her friends gave her a ‘slushy/ICEE’ and she said shortly after she did not remember what happened. She was later told that her friends had seen him ‘all over her.’ ... Thereupon, her father took her to the USA Children’s and Women’s Hospital for an examination. She says she had no sexual encounter of any kind prior to this.”
(C. 79.)
“Genitalia: ... [The victim] ... was examined using a colposcope at 16-pow-er magnification.... There was a deep transection at the 6:00 o’clock position. The opposing edges were slightly red. The hymenal rim was moderately estro-genized.”
(C. 80.)
“Physical Examination: Abnormal findings.”
(C. 80-81.)
Under the “FINDINGS ” section the report states:
“Conclusion, opinion, and/or remarks: It appears from history that this child was given a date rape drug, possibly rohypnol, and was told that she was assaulted by a 29-year-old male. She was taken to the emergency room at USA Children’s and Women’s Hospital. A pregnancy test was not done on this visit, but after information is obtained from the CEC a decision will be made whether or not to perform a UCG or an HCG.”
(C. 81.)
The SCAN summary report reflects that a copy of the SCAN summary report was to be provided to “Assistant District Attorney,” “Child Protective Worker,” “Investigation Law Officer,” and “Dr. John Shriner, CMC.” (C. 81.)
Following the admission of the SCAN summary, Dr. Kirk was asked to relate the conclusions she had reached from reviewing the victim’s file. Dr. Kirk testified that, the first thing she did, before reading any of Dr. Shriner’s notes or opinions, was review Dr. Shriner’s drawings that charted the victim’s injuries, and from his drawings she formed her own independent opinion regarding the victim’s injuries. According to Dr. Kirk, Dr. Shriner’s drawings disclosed an internal tear to the victim’s hymen in the bottom inferior section — which is called the six o’clock position. According to Dr. Kirk, the tear depicted in the drawing was a complete tear “very deep” inside the victim past the pelvic bone. (R. 136.) Dr. Kirk stated that because the injury was inside the victim, it was not an injury sustained from falling on some object such as the top tube of a bicycle. In sum, Dr. Kirk testified that the information she perceived from Dr. Shriner’s drawings disclosed physical injury consistent with a medical diagnosis of sexual abuse.
Dr. Kirk stated that injuries like the victim’s usually heal very quickly, in about three days, but Dr. Shriner’s SCAN summary noted that the injury had “reddened edges.” (R. 137.) Dr. Kirk stated that the red edges indicated that the injury had not healed. Dr. Kirk stated that it was *989 “unusual” that an injury inflicted on October 21 had not healed by November 29, but it was “not unheard of.” (R. 137.) She stated that “redness is a nonspecific finding and can occur from various different things, like infection and things like that.” (R 139.) Dr. Kirk stated that in her opinion a “trauma” had occurred, she could not “specifically date the injury” and she had no opinion as to what caused the victim’s injury. (R. 140.)
I.
The only issues on appeal are whether the trial court erred 1) in admitting into evidence, over a defense objection, the SCAN summary report compiled by Dr. John Shriner, who was unavailable to testify, and 2) in admitting, over a defense objection, the testimony of Dr. Jessica Kirk, whose expert opinion that the victim had injuries consistent with a sexual assault was based on her review of Dr. Shriner’s notes and the SCAN summary report.
Naquin contends that Dr. Shriner’s SCAN report and Dr. Kirk’s opinion based on that report were both inadmissible “testimonial” hearsay evidence because, he argues, the evidence had been “created primarily for law enforcement purposes and use at trial.” (Naquin’s brief, at p. 21.) Naquin argues that Dr. Kirk’s presentation of testimony as a “surrogate” for Dr. Shriner denied Naquin the “opportunity to cross-examine Shriner on [his SCAN] findings, and their significance.” (Naquin’s brief, at p. 23.) Naquin asserts that cross-examining Dr. Shriner was “crucial” because the victim’s earlier examination by the emergency-room physician did not disclose the hymenal tear that Dr. Shriner documented in his SCAN summary 40 days after the alleged sexual assault. (Na-quin’s brief, at p. 23.) This hymenal tear, Naquin argues, was the only physical evidence of penetration, and it was inconsistent with the emergency-room examination that took place immediately after the alleged rape — which disclosed only an external abrasion or bruise.
The United States Supreme Court in Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), held that a nontestifying witness’s “testimonial” statements are not admissible against a Confrontation Clause challenge unless the witness is unavailable and the defendant has had a prior opportunity to cross-examine the absent witness. Here, Dr. Shriner was unavailable for trial and there was no assertion that Naquin had had a prior opportunity to cross-examine Dr. Shriner. Thus, the threshold question is whether Dr. Shriner’s SCAN report or Dr. Kirk’s opinion based on the report constitute “testimonial” evidence. Naquin relies on United States v. Magyari, 63 M.J. 123 (C.A.A.F.2006), which this Court cited in Ware v. State, [Ms. CR-08-1177, March 25, 2011] — So.3d — (Ala.Crim.App.2011), to support his argument that “lab results or other types of routine records may become testimonial where a defendant is already under investigation, and where the testing is initiated by the prosecution to discover incriminating evidence.” (Naquin’s brief, at pp. 14-15.) Naquin also cites Melendez-Diaz v. Massachusetts, 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009), as holding that where a forensic report is created to serve as evidence at trial, it is testimonial evidence, and Bullcoming v. New Mexico, 564 U.S. —, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011), as holding that a laboratory report was testimonial evidence and also prohibiting a “surrogate” expert from testifying for the expert who actually performed the test in question.[2]
*990 A.
Dr. Kirk’s independent expert opinion based on her review of the victim’s file, which included Dr. Shriner’s drawings and the SCAN report, was admissible. In Williams v. Illinois, — U.S. —, 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012), decided June 18, 2012, four of the five concurring United States Supreme Court Justices determined as part of their rationale that, “[u]nder settled evidence law, an expert may express an opinion that is based on facts that the expert assumes, but does not know, to be true,” Williams v. Illinois, — U.S. at —, 132 S.Ct. at 2228.[3] In Williams,
“the Illinois state police laboratory sent vaginal swabs from a rape victim to a private diagnostic laboratory for DNA testing. The diagnostic lab sent back a report containing a male DNA profile produced from semen taken from those swabs. A forensic specialist at the state lab then matched the profile to one produced by the state lab from defendant’s blood sample. At defendant’s subsequent bench trial for sexual assault, the forensic specialist from the state lab testified that there was ‘a computer match generated of the male DNA profile found in semen from the vaginal swabs of [the victim] to a male DNA profile that had been identified as having originated from’ defendant. The diagnostic lab’s report was not admitted into evidence and the prosecution did not call an analyst from that lab to testify about the profile. The defense moved to exclude the state forensic specialist’s testimony with regard to testing done by the diagnostic lab on Confrontation Clause grounds, but the trial court admitted the testimony and later found defendant guilty. After his conviction was confirmed on appeal in Illinois, defendant sought review in the United States Supreme Court, arguing that the state forensic expert’s testimony should have been excluded under Melendez-Diaz v. Massachusetts (2009) 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314, supra, § 24, and Bullcoming v. New Mexico (2011) 564 U.S. —, 131 S.Ct. 2705, 180 L.Ed.2d 610, supra, § 24.”
3 Witkin, Cal. Evid. 5th (2012) § 33, p. 80. (Emphasis added.)
The plurality of the Williams Court stated:
“Under settled evidence law, an expert may express an opinion that is based on facts that .the expert assumes, but does not know, to be true. It is then up to the party who calls the expert to introduce other evidence establishing the facts assumed by the expert. While it was once the practice for an expert who based an opinion on assumed facts to testify in the form of an answer to a hypothetical question, modern practice does not demand this formality and, in appropriate cases, permits an expert to explain the facts on which his or her opinion is based without testifying to the truth of those facts. See Fed. Rule Evid. 703. That is precisely what oc *991 curred in this case, and we should .not lightly ‘swee[p] away an accepted rule governing the admission of scientific evidence.’ Melendez-Diaz v. Massachusetts, 557 U.S. 305, 330 (2009) (KENNEDY, J., dissenting).
“We now conclude that this form of expert testimony does not violate the Confrontation Clause because that provision has no application to out-of-court statements that are not offered to prove the truth of the matter asserted. When an expert testifies for the prosecution in a criminal case, the defendant has the opportunity to cross-examine the expert about any statements that are offered for their truth. Out-of-court statements that are related by the expert solely for the purpose of explaining the assumptions on which that opinion rests are not offered for their truth and thus fall outside the scope of the Confrontation Clause.”
Williams v. Illinois, — U.S. —, —, 132 S.Ct. 2221, 2228, 183 L.Ed.2d 89 (2012). Thus, based on Williams, Dr. Kirk’s testimony presenting her own independent opinion based on her review of the victim’s file, which included Dr. Shriner’s drawings and SCAN report, was properly admitted over Naquin’s Confrontation Clause objection.
B.
The admission into evidence of Dr. Shriner’s SCAN summary report was error. As previously stated, the threshold question is whether the SCAN report was testimonial.
Although the Crawford Court did not define “testimonial,” it noted that some “core class of ‘testimonial’ statements exist.” 541 U.S. at 51. That class includes “ ‘statements that were made under circumstances which would lead an objective witness reasonably to believe that' the statement would be available for use at a later trial.’ ” Crawford v. Washington, 541 U.S. at 52 (quoting brief for National Association of Criminal Defense Lawyers as amici curiae 3). Later, in Davis v. Washington, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), the Court provided some guidance regarding what constituted “testimonial” evidence when it held that if the “primary purpose” of obtaining the out-of-court statements was to gather evidence for trial, the statements were testimonial.[4]
As explained by Robert P. Mosteller in his article, Symposium — Confrontation in Children’s Cases: The Dimensions Of Limited Coverage, 20 J.L. & Pol’y 393, 417-18 (2012):
“Under Crawford’s testimonial doctrine, when a witness takes the stand and repeats an out-of-court statement that she has heard, the Confrontation Clause is implicated only if the statement being repeated by this ‘ear witness’ was testimonial in nature. Thus, if a doctor takes the stand and repeats a child’s statement made to secure medical treatment, or if a grandmother takes the stand and repeats her granddaughter’s statements about sexual abuse elicited out of concern for the child’s welfare, no constitutional violation has occurred. The nontestimonial nature of the declar-ant’s statement means that it is exempt from scrutiny under the confrontation doctrine.
“However, the ‘ear witness’ must testify. If instead, the child’s statements are presented through a document pre *992 pared by the ‘ear witness’ [(here Dr. Shriner)] with an expectation that it would be used as a record of past events for potential use in a criminal prosecution, then the Confrontation Clause is violated. This is not because the nature of the declarant’s original statement was testimonial, but because the repetition of that statement occurs in the form of a testimonial statement from the nontesti-fying ‘ear witness[,]’ [i.e., Dr. Shriner].”
20 J.L. & Pol’y at 417-18.
Here, the victim was subjected to a gynecological examination at a hospital emergency room because Naquin was accused of raping her. The record does not disclose who referred the victim to the SCAN clinic, but the record does disclose that the victim was referred there following her hospital emergency-room examination. The name of the clinic, “Sexual Child Abuse and Neglect,” itself expresses that one purpose of the clinic is to examine children who have been sexually abused or who are suspected of having been sexually abused. Sexual abuse of a child is a crime. See generally § 13A-6-61 through § 13A-6-70, Ala.Code 1975. From this purpose it follows that a child is referred to the SCAN clinic to obtain evidence as part of a criminal investigation or to collect evidence for use in a criminal trial. The SCAN clinic’s use of a colposcope to discover signs of penetration also suggest that the purpose of a SCAN examination is to acquire evidence for a prosecution. Also, the SCAN report disclosed that copies of the report were to be sent to the “Assistant District Attorney,” “Child Protective Worker,” and “Investigation Law Officer.” The victim was subjected to the gynecological examinations because Naquin had been accused of raping her. Thus, providing the SCAN report to those involved in the prosecution of crimes suggest that the charges against Naquin were filed based on the results of the SCAN examination. Therefore, it appears that the primary purpose of referring the victim for a second gynecological examination at the SCAN clinic was for a forensic or investigative purpose in preparation for Naquin’s prosecution. (C. 81.)
Additionally, the SCAN report went beyond providing objective facts regarding the victim’s physical examination. The SCAN report in this case named Naquin as having apparently given the victim a date-rape drug and then raping her. As Justice Breyer stated in his concurring opinion in Williams v. Illinois, “[t]he de-clarante, here Dr. Shriner,] was essentially an adverse witness making an accusatory, testimonial statement....” — U.S. at —, 132 S.Ct. at 2251.
Thus, we conclude that the SCAN report, at the very least, included testimonial statements. Therefore, its admission into evidence without redaction of the testimonial statements or without the defendant having an opportunity to cross-examine Dr. Shriner violated the Confrontation Clause.

Harmless-Error Analysis

We must determine if the admission of Dr. Shriner’s SCAN report was harmless error.
“ ‘No judgment may be reversed or set aside ... on the ground of ... improper admission or rejection of evidence, nor for error as to any matter of pleading or procedure, unless in the opinion of the court to which the appeal is taken or application is made, after examination of the entire cause, it should appear that the error complained of has probably injuriously affected substantial rights of the parties.’ ”
Naylor v. State, 108 So.3d 1063 (Ala.Crim.App.2012) (quoting Rule 45, Ala. R.App. P., and citing Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)).
*993 “ ‘The proper inquiry in determining whether the constitutional error in this case is harmless was set out by the United States Supreme Court in Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967):
“ ‘ “In fashioning a harmless-eon-stitutional-error rule, we must recognize that harmless-error rules can work very unfair and mischievous results when, for example, highly important and persuasive evidence or argument, though legally forbidden, finds its way into a trial in which the question of guilt or innocence is a close one....
“ . We prefer the approach of this Court in deciding what was harmless error in our recent case of Fahy v. Connecticut, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 [ (1963) ]. There we said: ‘The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.’ Id., at 86-87, 84 S.Ct. at 230.... Certainly error, constitutional error, in illegally admitted highly prejudicial evidence or comments, casts on someone other than the person prejudiced by it a burden to show that it was harmless. It is for that reason that the original common-law harmless-error rule put the burden on the beneficiary of the error either to prove that there was not injury or to suffer a reversal of his erroneously obtained judgment. There is little, if any, difference between our statement in Fahy v. State of Connecticut about ‘whether there is a reasonable possibility that the evidence complained of did not contribute to the conviction’ and requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. We, therefore, do no more than adhere to the meaning of our Fahy case when we hold, as we now do, that before a federal constitutional error can be held harmless the court must be able to declare a belief that it was harmless beyond a reasonable doubt. While appellate courts do not ordinarily have the original task of applying such a test, it is a familiar standard to all courts, and we believe its adoption will provide a more workable standard .... ”
“ ‘386 U.S. at 23-24, 87 S.Ct. 824, 17 L.Ed.2d 705.
‘““In order for the error to be deemed harmless under Rule 45, [Ala. R.App. P.], the state must establish that the error did not injuriously affect the appellant’s substantial rights.” Coral v. State, 628 So.2d [954] at 973 [ (Ala.Crim.App.1992) ].’
“Young v. State, 730 So.2d 1251, 1255 (Ala.Crim.App.1998).”
Ward v. State, 105 So.3d 449, 459 (Ala.Crim.App.2012).
The “finding” of the SCAN report that it appeared that the victim had been given a “date-rape drug” was not cumulative to other evidence and was highly prejudicial. This “finding” implies that Na-quin planned to commit a rape and that he intentionally caused the victim to become unconscious for the purpose of raping her. The SCAN report findings also concluded that the victim was told that she had been sexually assaulted by a 29-year-old man and the report identified the 29-year-old man as Naquin. This addressed the ultimate issue in the case—that the victim was raped by Naquin. Whatley v. State, 146 So.3d 437, 462 (Ala.Crim.App.2010) (opinion on return to remand) (“ ‘An ultimate *994 issue has been defined as the last question that must be determined by the jury. See Black’s Law Dictionary [1522 (6th ed.1990) ].’ ”) (quoting Tims v. State, 711 So.2d 1118, 1125 (Ala.Crim.App.1997)). See Naylor v. State, 108 So.3d at 1063, citing: “Sanders v. State, 986 So.2d 1230, 1232 (Ala.Crim.App.2007) (‘[T]he ultimate issue in similar cases is whether the defendant had sexually abused the child, not whether the child had in fact been sexually abused.’); Kennedy v. State, 929 So.2d 515 (Ala.Crim.App.2005) (the fact at issue was whether Kennedy was responsible for the victim’s abuse); Sexton v. State, 529 So.2d 1041, 1048 (Ala.Crim.App.1988) (‘The ultimate fact in issue, however, was whether the defendant raped and sodomized the child _’).”; Rule 704, Ala. R. Evid. (“Testimony in the form of an opinion or inference otherwise admissible is to be excluded if it embraces an ultimate issue to be decided by the trier of fact.”).
Also, W.D.C. testified that the victim got up and ran into the woods when the alleged sexual activity was interrupted. But for the SCAN report, it is possible that a juror could have found that this testimony provided a reasonable doubt as to Naquin’s guilt for the charge of engaging in sex with a female who was incapable of consenting. See § 13A-6-61(a)(2). Moreover, the SCAN report was prepared by an expert who concluded that a date-rape drug had been administered to facilitate a rape. This conclusion is extremely prejudicial, and its impact on the jury is unknown. Therefore, we cannot conclude that the admission of the SCAN report did not injuriously affect Naquin’s substantial rights or that this was harmless beyond a reasonable doubt.
The dissent cites incriminating testimony from W.D.C. and C.H. and the testimony of Dr. Kirk to conclude that there was “ample evidence to support Na-quin’s rape convictions aside from the SCAN report” and, thus, that the admission of the report was “harmless beyond a reasonable doubt.” To determine that the SCAN report was of little consequence in light of “ample” evidence of guilt, the dissenting judges have discounted the effect it may have had on the jurors and assumed the role of fact-finder and weighed the credibility of the witnesses while ignoring that the report bolstered the credibility of incriminating witnesses and decimated Na-quin’s defense by reaching the ultimate issue in the case — that it was Naquin who had had sex with J.R. Moreover,
“the proper inquiry here is not whether evidence of the defendant’s guilt is overwhelming but, instead, whether a substantial right of the defendant has or probably has been adversely affected.... See Goforth v. State, 183 Ala. 66, 63 So. 8 (1913); McAllister v. State, 30 Ala.App. 366, 6 So.2d 32 (1942); Green v. State, 258 Ala. 471, 64 So.2d 84 (1953). Overwhelming evidence of guilt does not render prejudicial error harmless under Rule 45, Ala.R.App.P. See Ex parte Johnson, 507 So.2d 1351 (Ala.1986).”
Ex parte Lowe, 514 So.2d 1049, 1050 (Ala.1987).
In Malone v. City of Silverhill, 575 So.2d 101, 101-02 (Ala.Crim.App.1989), rev’d, Ex parte Malone, 575 So.2d 106, 107 (Ala.1990), Malone was convicted of driving under the influence of alcohol. The evidence presented at trial was as follows: Malone was in a restaurant for three hours during which time he consumed an “unknown amount of ‘Canadian Mist and Seven-Up’ ”; Malone left the restaurant and began his 10-minute drive home in his truck; Officer Fred Freeman observed Malone’s truck stopped “for an unusually long period of time” at a four-way stop; Officer Freeman followed Malone for “three-quarters of a mile and observed his vehicle cross the center line several times”; *995 Officer Freeman stopped Malone; when Malone got out of his truck “he had to hold to the bed of the truck as he walked”; Officer Freeman “smelled alcohol on [Malone’s] breath”; Malone told Officer Freeman “in a somewhat slurred voice, that he had been drinking”; Ofc. Freeman administered the Horizontal Gaze Nystagmus (HGN) test to Malone; and “[t]he test results indicated that [Malone] had been consuming alcoholic beverages.” Malone v. City of Silverhill, 575 So.2d 101, 101-02 (Ala.Crim.App.1989). Malone was arrested and was convicted for reckless driving and driving under the influence (“DUI”) of alcohol. Malone challenged his DUI conviction on appeal, arguing that a proper foundation to allow the admission of the HGN test had not been laid. This Court held that the HGN test was improperly admitted into evidence but that the evidence of Malone’s guilt “contained in the record was overwhelming” and affirmed his conviction. Malone v. City of Silverhill, 575 So.2d at 105. The Alabama Supreme Court granted certiorari review. That Court reversed the Court of Criminal Appeals, disagreeing that the error in admitting the HGN test “did not require reversal of Malone’s conviction because the other evidence supporting his conviction was ‘overwhelming.’ 575 So.2d at 105.” Citing Ex parte Lowe, 514 So.2d 1049, 1050 (Ala.1987), the Alabama Supreme Court held:
“‘[T]he proper inquiry here is not whether evidence of the defendant’s guilt is overwhelming but, instead, whether a substantial right of the defendant has or probably has been adversely affected.... Overwhelming evidence of guilt does not render prejudicial error harmless under Rule 45, Ala.R.App.P.’ (Citations omitted.)
“The problem created by the improper admission of the HGN evidence is due to the scientific nature of the test and the disproportionate impact it might have had on the jury’s decision-making process. As noted by the Court of Criminal Appeals, a jury ‘ “might give undue weight to [HGN] evidence since it may appear to lend the certainty of an exact discipline to problematic factfinding.’” 575 So.2d at 104 (quoting G. Lilly, An Introduction to the Law of Evidence 407 (1978)). In light of these considerations and the adverse effect that the erroneous admission of the HGN test evidence might have had on Malone’s right to a fair trial, the judgment of the Court of Criminal Appeals is reversed, and the cause is remanded. The Court of Criminal Appeals is instructed to remand this cause for a new trial.”
Ex parte Malone, 575 So.2d 106, 107 (Ala.1990). That the evidence against Naquin was “ample” or overwhelming is no barrier to a reversal if a substantial right of Na-quin’s “has or probably has been adversely effected.” Rule 45, Ala. R.App. P. Given the extremely prejudicial content of the SCAN, it is reasonable to conclude that its erroneous admission probably had an adverse effect on the “jury’s decision-making process.” 575 So.2d at 107.
Accordingly, we conclude that the admission of the SCAN report without an opportunity to cross-examine Dr. Shriner was not harmless error. For the reasons set forth in Part I.B., the trial court’s judgment is reversed and this cause is remanded for a new trial.
REVERSED AND REMANDED.
WINDOM, P.J., and KELLUM, J., concur.
BURKE, J., dissents, with opinion, which JOINER, J., joins.

. The appellant’s name is spelled "Anquin” in some places in the record.

. We also note that in Melendez-Diaz and Bullcoming the reports, although routine business records, were found to be testimonial. We note that this Court has found an *990 autopsy report to be nontestimonial and thus admissible as a business record with no Confrontation Clause implications. Thompson v. State 153 So.3d 84 (Ala.Crim.App.2012); Perkins v. State, 897 So.2d 457 (Ala.Crim.App.2004) (not a violation of the Confrontation Clause to admit an autopsy report without the medical examiner's testimony). This Court has also found that the admission of an autopsy report without testimony from the forensic examiner who conducted the autopsy to be a violation of the Confrontation Clause. Smith v. State, 898 So.2d 907 (Ala.Crim.App.2004.)

. The fifth concurring Justice, Justice Thomas, found that the DNA profile at issue "lacked the requisite ‘formality and solemnity’ to be considered ' "testimonial” ’ for purposes of the Confrontation Clause.” — U.S. at —, 132 S.Ct. at 2255 (Thomas, J., concurring in the judgment).

. Davis involved statements made to police during an emergency. The Court determined that the statements were not testimonial and, thus, had no Confrontation Clause implications because the "primary purpose” of the statements was to address an ongoing emergency.